Donald MILLER, III, By and Through His Parents and Legal Guardians, Donald and Tina MILLER, Jr., Plaintiffs

v.

**PENN MANOR SCHOOL DISTRICT** and Penn Manor School District Board of Directors, Defendants.

Civil Action No. 08–cv–00273.

United States District Court, E.D. Pennsylvania.

Sept. 30, 2008.

Leonard G. Brown, III, David R. Dye, Esquires, Lancaster, PA, for Plaintiffs.

Kevin M. French, William J. Zee, III, Esquires, Lancaster, PA, for Defendants.

## ORDER

JAMES KNOLL GARDNER, District Judge.

NOW, this 30th day of September, 2008, upon consideration of the following documents:

(1) Motion for Preliminary Injunction, which motion was filed on behalf of plaintiffs on January 17, 2008; together with

(1)(A) Brief in Support of Motion for Preliminary Injunction, which brief was filed January 18, 2008;

(1)(B) Letter dated April 25, 2008 forwarding a case from counsel for plaintiffs, Leonard G. Brown, III, Esquire;

(1)(C) Letter dated August 5, 2008 forwarding a case from Attorney Brown;

(1)(D) Letter dated September 3, 2008 forwarding a case from Attorney Brown;

(1)(E) Response of Defendants, Penn Manor School District and Penn Manor School District Board of Directors, in Opposition to Plaintiff's Motion for Preliminary Injunction, which response was filed February 25, 2008; and

(1)(F) Letter brief dated August 8, 2008 from counsel for defendants, Kevin M. French, Esquire, in response to the August 5, 2008 letter from Attorney Brown;

(2) Plaintiff's Proposed Findings of Fact and Conclusions of Law, which were filed March 13, 2008; together with

(2)(A) Memorandum in Support of Plaintiff's Findings of Fact and Conclusions of Law, which memorandum was filed March 13, 2008;

(3) Proposed Findings of Fact and Conclusions of Law of Defendants Penn Manor School District and Penn Manor School District Board of Directors, filed March 14, 2008; together with

(3)(A) Memorandum in Support of Defendants' Findings of Fact and Conclusions of Law, which memorandum was filed March 14, 2008;

upon consideration of the pleadings, record papers, and hearing exhibits; after hearing held March 20, 2008; and for the reasons articulated in the accompanying Opinion, including Findings of Fact and legal Discussion,

IT IS ORDERED that plaintiffs' Motion for Preliminary Injunction is granted in part and denied in part.

IT IS FURTHER ORDERED that the portion of Penn Manor School District Pol-

icy 220 adopted February 8, 1999 entitled School Expression which prohibits expressions that: "Seek to establish the supremacy of a particular religious denomination, sect or point of view," is deemed unconstitutionally overbroad and vague.[1]

*IT IS FURTHER ORDERED* that defendants Penn Manor School District, Penn Manor School District Board of Directors, their employees, agents or assigns are preliminarily enjoined and restrained from enforcing or reenacting that portion of former District Policy 220 which prohibits expressions that: "Seek to establish the supremacy of a particular religious denomination, sect or point of view," until the entry of final judgment in this matter or further Order of court.

*IT IS FURTHER ORDERED* that the portion of the Penn Manor School District Student Handbook that prohibits any student dress or expression that "is a distraction to the educational environment," is deemed unconstitutionally overbroad and vague.

*IT IS FURTHER ORDERED* that defendants Penn Manor School District, Penn Manor School District Board of Directors, their employees, agents or assigns are preliminarily enjoined and restrained from enforcing the portion of the Penn Manor School District Student Handbook that prohibits any student dress or expression that "is a distraction to the educational environment," until the entry of final judgment in this matter or further Order of court.

*IT IS FURTHER ORDERED* that pursuant to Federal Rule of Civil Procedure 65(c) this Order be and is hereby conditioned upon Plaintiffs' filing with the Clerk of this Court an undertaking in the form of a bond, certified check, cash or other form of security acceptable to the Clerk of Court in the amount of $5,000.00 no later than October 8, 2008, receipt of which will be acknowledged by the Clerk of Court to secure the payment of such costs and damages not to exceed such sum as may be suffered or sustained by any party who is found to be wrongfully restrained by this Order.

*IT IS FURTHER ORDERED* that in all other respects plaintiffs' Motion for Preliminary Injunction is denied.

## OPINION

This matter is before the court on the Motion for Preliminary Injunction filed on behalf of plaintiff student Donald Miller, III, by his parents, on January 17, 2008. The Response of Defendants, Penn Manor School District and Penn Manor School District Board of Directors, in Opposition to Plaintiffs' Motion for Preliminary Injunction was filed February 28, 2008.

A hearing on plaintiffs' motion was conducted before the undersigned on March 20, 2008. The court heard testimony from one witness for the plaintiff and three defense witnesses.[2] In addition, plaintiff introduced seven exhibits into evidence at the hearing, and defendant introduced seven exhibits. There was one joint exhibit.[3]

---

1. I note that on February 4, 2008 the Penn Manor School District revised District Policy 220 and removed the offending language regarding religious expression.

2. Plaintiff offered the testimony of plaintiff Donald Miller, III. Defendants offered the testimony of Christopher E. Moritzen, Assistant Principal of Penn Manor High School; Dr. Janice M. Mindish, Principal of Penn Manor

High School; and Donald F. Stewart, Superintendent of Schools for the Penn Manor School District.

3. The parties jointly offered the deposition testimony of Diane Baireuther, a special education mathematics teacher at Penn Manor High School.

For the reasons articulated in this Opinion, I grant in part and deny in part plaintiffs' Motion for Preliminary Injunction.

Specifically, I grant plaintiffs' Motion for Preliminary Injunction regarding defendants' unconstitutionally overbroad and vague policy prohibiting student expressions that promote religion.

I grant plaintiffs' Motion for Preliminary Injunction regarding that unconstitutionally overbroad and vague portion of defendant School District's Student Handbook prohibiting student dress or expression that is a distraction to the educational environment.

In all other respects, I deny plaintiffs' Motion for Preliminary Injunction and conclude that defendants' policy prohibiting promoting violence is not unconstitutionally overbroad and vague, and is not unconstitutional as applied to prohibiting plaintiff Donald Miller, III from wearing a T-shirt promoting violence and violation of law.

## JURISDICTION

Jurisdiction in this case is based upon federal question jurisdiction pursuant to 28 U.S.C. § 1331.

## VENUE

Venue is proper pursuant to 28 U.S.C. § 1391(b) because the events giving rise to plaintiff's claims allegedly occurred in Lancaster County, Pennsylvania, which is located within this judicial district.

## PLAINTIFFS' COMPLAINT

On January 16, 2008 plaintiff Donald Miller, III, through his parents and legal guardians Donald Miller, Jr. and Tina Miller, filed a five-count Complaint alleging that defendant Penn Manor School District's speech-restrictive policies violate his right to free speech and religion.

Specifically, Count I of plaintiff's Complaint alleges a cause of action for violation of his constitutional right of freedom of expression under the First Amendment to the United States Constitution and brought through 42 U.S.C. § 1983 for the School District's censoring of his speech.

Count II is a Section 1983 claim for violation of plaintiff's First Amendment right to wear a T-shirt that advocates the capture or elimination of America's enemies, namely, terrorists.

Count III avers a cause of action for violation of plaintiff's due process rights (the Complaint does not specify whether the claim is brought pursuant to the Fifth or Fourteenth Amendments to the United States Constitution).

Count IV alleges a violation of the Free Speech Clause of the First Amendment and is a facial challenge to School District Policy 220 alleging that defendants' policy prohibits student expression regarding the supremacy of a religious point of view.

Count V is a facial challenge to School District Policy 220 under the Free Exercise Clause of the First Amendment alleging that defendants' policy prohibits student expression regarding the supremacy of a religion, denomination, sect or point of view.

## FINDINGS OF FACT

Based upon the pleadings, record papers, affidavits, depositions, exhibits, stipulations of counsel and the evidence presented at the hearing held March 20, 2008, the pertinent facts are as follows.

### Parties

Plaintiff Donald Miller, III, ("Donald") is a minor, fourteen years of age, and is the natural-born son of plaintiffs Donald Miller, Jr. ("Mr. Miller") and Tina Miller

("Mrs. Miller"), his parents and legal guardians. At the time of these events, Donald was a ninth-grade student at Penn Manor High School.

Defendant Penn Manor School District ("District") is a municipal corporation organized and existing under the laws of the Commonwealth of Pennsylvania. The District is governed by the Penn Manor School District Board of Directors ("Board of Directors") who, in conjunction with the Superintendent of Schools, Donald F. Stewart, establish and enforce the District's policies, including certain policies which are the subject of this litigation.

### T–Shirt Incidents

In June 2007 Donald's uncle, Brian Souders, graduated from the United States Army Infantry's School. Mrs. Miller attended her brother's graduation at Fort Benning, Georgia. While on that trip, Mr. Souders bought a T-shirt for Donald at the Fort Benning Post Exchange. Mr. Souders is currently stationed in Iraq.

During the second week of the 2007–2008 school year, Donald wore this T-shirt to school. The T-shirt prominently displays images of an automatic handgun on the front pocket area and back of the T-shirt. The front pocket of the T-shirt is also imprinted with the statement "Volunteer Homeland Security" with the image of an automatic handgun placed between the word "Volunteer" above the handgun and the words "Homeland Security" below the handgun.

The back of the T-shirt is imprinted with the statement "Special Issue–Resident–Lifetime License, United States Terrorist Hunting Permit, Permit No. 91101, Gun Owner–No Bag Limit" in block letters superimposed over a larger automatic handgun.

On the date that Donald initially wore the T-shirt inside the high school, Diane Baireuther, Donald's mathematics teacher, was alerted to Donald's shirt through a note written by a female student who indicated that she was uncomfortable with the T-shirt's content. The female student asked Ms. Baireuther if she would talk to Donald about it. Ms. Baireuther asked Donald to step into the hallway and discussed the message and images printed on the T-shirt.

Specifically, Ms. Baireuther explained to Donald that the shirt's message promoted the hunting and killing of human beings and might not be appropriate for school. Moreover, the picture of the gun on the shirt might make it uncomfortable or frightening for other students because of previous incidents of students bringing guns to school and shooting students at other schools. Donald responded that he would never bring a gun to school or shoot a human being. Ms. Baireuther did not believe that Donald would either bring a gun to school or shoot another human being.

Ms. Baireuther further explained to Donald that she would check with school administrators to determine if the T-shirt was in violation of School District policy. Donald was concerned that Ms. Baireuther would make him turn his T-shirt inside out because that would make his mother "freak out". Donald was then permitted to return to class.

Later, during that same class period, Ms. Baireuther took aside the female student who had written the note, and told the student that she had spoken with Donald about the shirt and that she would check with the school administration concerning whether the T-shirt violated School District policy.

When she spoke with the building principal, Ms. Baireuther was advised that the

T-shirt was inappropriate and violated established school district policy.

A few days later, Donald wore the T-shirt to school again. Ms. Baireuther advised him that she consulted with School District administrators who confirmed that Donald was not permitted to wear this particular T-shirt to school, and that if he wore the T-shirt again she would have to send him to the principal's office.

Despite the directive from Ms. Baireuther, Donald wore the T-shirt again on November 28, 2007. When Donald entered her class on that date, Ms. Baireuther saw the T-shirt and took Donald to the hallway to speak with him. Ms. Baireuther reiterated to Donald that he was not permitted to wear the T-shirt to school.

Donald protested by stating that he did not feel that there was anything wrong with the T-shirt. Ms. Baireuther suggested that Donald go to the principal's office and speak with the Assistant Principal.

Donald reported to the Principal's office and was met by Assistant Principal Christopher Moritzen. Mr. Moritzen noted that Donald had worn the offending T-shirt the previous year at the Penn Manor Middle School near the conclusion of the 2006–2007 school year.

Donald had previously worn the same T-shirt in June 2007 at the end of his eighth grade year and been directed by the Assistant Principal of the middle school, Richard Eby, to turn the shirt inside out.

During the meeting between Donald and Mr. Moritzen, Mr. Moritzen reminded Donald that the same rules governing dress, grooming and student expression which applied in the middle school also applied in the high school. He advised Donald that the T-shirt violated those rules. Donald responded that his parents would "freak out" if he were not permitted to wear the shirt to school.

When Mr. Moritzen directed Donald to go to the restroom and turn the T-shirt inside out, Donald stood up, and as he walked out the door stated: "This is bullshit." Donald was then issued a two-hour detention by Mr. Moritzen for the use of foul language and failure to follow direction.

The next day at approximately 11:30 a.m., Mr. and Mrs. Miller went to Penn Manor High School to discuss the situation regarding Donald's T-shirt with Mr. Moritzen. Mr. Miller was very upset about Mr. Moritzen making Donald turn his T-shirt inside out. Mr. Moritzen reviewed the relevant sections of the Student Handbook with the Millers and explained that Donald's T-shirt violated the School District's dress code policy, that the T-shirt promoted violence and was unacceptable clothing in the high school.

Mr. Moritzen further explained that the school administration believed that the message of the T-shirt advocated hunting human beings and that the image on the T-shirt was akin to a deer hunting license. Mr. Moritzen asked Mr. Miller if he understood the purpose of a deer hunting license. Mr. Miller responded that it was to "harvest" deer. When asked how he would "harvest" deer, Mr. Miller, did not respond.[4]

Mr. Miller became visibly upset with the questions being asked by Mr. Moritzen. Mr. Miller removed a piece of paper from his pocket and slammed it down on Mr. Moritzen's desk. Mr. Miller then told Mr.

---

**4.** I note that during his testimony at the hearing of this matter, Donald also referred to harvesting deer for food. Donald did acknowledge that in order to "harvest" a deer for food you would "shoot" it. Transcript of Preliminary Injunction Hearing conducted before me on March 20, 2008 at pages 26–27.

Moritzen that Mr. Moritzen could write to the soldier currently serving in Iraq, whose address was on the piece of paper, and explain to him how he, Mr. Moritzen, was not being supportive of the troops in Iraq by not allowing Donald to wear his T-shirt in school.

Mr. Moritzen attempted to explain that this involved the message on the shirt and not a lack of support for the troops. At this point Mr. Miller informed Mr. Moritzen that he was calling his lawyer. Mr. Miller asked who else he could talk to and Mr. Moritzen responded Dr. Mindish, the Principal. The Millers were given a copy of the Student Handbook and Mr. Moritzen's business card and left the school.

On January 7, 2008, the Board of Directors met to discuss the situation. The Board determined that under the circumstances no disciplinary action would be taken against Donald until the matter was resolved. The Board further determined that because Donald's T-shirt did not constitute protected student expression under school district policy, it could not be worn in school.

By letter dated January 8, 2008 the Solicitor for the School District, Robert M. Frankhouser, Jr., Esquire, advised plaintiffs' counsel that no disciplinary action would be taken until resolution of the matter; and that the Board was in the process of revising certain aspects of the student expression policy but that the T-shirt could not be worn to school.

As of the date of the within court hearing, the two-hour detention discipline imposed on Donald for his failure to follow directions and foul language has not been enforced. Dr. Mindish testified that the discipline and will not be enforced until completion of this litigation.

After Donald and his parents filed this lawsuit, there was a moderate amount of newspaper and internet coverage regarding Donald not being permitted to wear his T-shirt. Specifically, there was an article on the front page of the local Sunday newspaper. Moreover, this matter has attracted some national attention based upon an article posted on the Foxnews website.

The media coverage of this litigation has made it more likely that permitting Donald to wear the T-shirt in school in the future may cause some level of disruption at the school and possibly some measure of repercussions from other students.

### Penn Manor School District Policies

Penn Manor School District does not have a school uniform policy. However, student dress and grooming is specifically governed by the Board of Director's policy together with provisions contained in the Student Handbook. The Board of Directors, from time to time, adopts policies to govern all Penn Manor School District students and personnel. The community at large is provided with ready access to the District's policies by way of the District's website.

Penn Manor School District Policy 220 [5] entitled Student Expression was enacted February 8, 1999. It was in effect during Fall 2007. It prohibits, among other things, student expression which incites violence, advocates the use of force or urges violations of law or school regulations.[6]

---

**5.** Defendant's Exhibit 3.

**6.** District Policy 220 provides in pertinent part:

220. STUDENT EXPRESSION

The Board respects the rights of students to express themselves in word or symbol and to distribute materials as a part of that expression, but it also recognizes that the exercise of that right must be limited by the district's responsibility to maintain an or-

On February 11, 2008, the Penn Manor School District revised District Policy 220.[7] Specifically, the District removed the prohibition of student expression seeking to establish the supremacy of a particular religious denomination, sect or point of view (Policy 220(2)). In addition, the revised District Policy 220 more fully describes the purpose and scope of the policy.[8]

derly school environment and protect the rights of all members of the school community.

The Board reserves the right to designate and prohibit manifestations of student expression which are not protected by the right of free expression because they violate the rights of others. Such expressions are those which:

1. Libel any specific person or persons.

2. Seek to establish the supremacy of a particular religious denomination, sect or point of view.

3. Advocate the use or advertise the availability of any substance or material which may reasonably be believed to constitute a direct and substantial danger to the health of students.

4. Are obscene or contain material deemed to be harmful to impressionable students who may receive them.

5. Incite violence, advocate use of force, or urge violation of law or school regulations.

6. Advertise goods or services for the benefit of profitmaking organizations.

7. Solicit funds for nonschool organizations or institutions when such solicitations have not been approved by the Board.

7. Defendants' Exhibit 4.

8. Revised District Policy 220 provides in pertinent part:

The right of public school students to engage in free expression is guaranteed by the Constitution of the United States and the constitution of the Commonwealth. The Board respects the right of students to express themselves in word or symbol and to distribute and post materials in areas designated by the District for posting nonschool materials. The Board also recognizes that exercise of these rights must be limited by the District's responsibility to maintain an orderly school environment and to protect the rights and health, safety and welfare of all members of the school community.

* * *

***Unprotected Student Expression***

The Board reserves the right to designate and prohibit manifestations of student expression that are not protected by the rights of free expression where such expression is likely to or does materially or substantially interfere with school activities, school work, or discipline and order on school property or at school activities and functions including but not limited to:

1. Libel of any specific person or persons.

2. Advocating the use of or advertising the availability of alcohol or illegal drugs or any other substance or material that may reasonably be believed to constitute a direct and serious danger to the health, safety or welfare of students or that is prohibited by law.

3. Using obscene, lewd, vulgar or profane language or images—whether verbal, written, or symbolic.

4. Inciting violence or mayhem; advocating use of unlawful force; or encouraging violation of federal, State, or municipal law, Board policy or district rules or regulations.

5. [Are] (sic) expression that is likely to or does materially or substantively interfere with the educational process, including school activities, school work, or discipline and order on school property or at school activities and functions; threatens serious harm to school or community; encourages unlawful or dangerous activity; or interferes with another's rights.

* * *

***Review of Student Expression***

School Officials shall not censor or restrict protected student expression for the sole reason that the viewpoint expressed therein is critical of the school or its administration, or because the views espoused are unpopular or may make people uncomfortable.

Student-initiated religious expression is permissible and shall not be prohibited except as to time, place and manner of distribution, or if the expression involved violates Board policy, e.g., because it is independently determined to constitute unprotected expression under the standards and definitions adopted by the Board.

In addition to District Policy 220 on student expression, the Penn Manor School District has District Policy 221 [9], which regulates dress and grooming of students. District Policy 221 was enacted February 8, 1999 and was in effect in Fall 2007.[10]

9. Defendants' Exhibit 5.

10. District Policy 221 provides:

> 221. DRESS AND GROOMING
> The Board recognizes that each student's mode of dress and grooming is a manifestation of personal style and individual preference.
> The Board will not interfere with the right of students and their parents to make decisions regarding their. appearance, except when their choices affect the educational program of the schools or the health and safety of others.
> Students may be required to wear certain types of clothing while participating in physical education classes, shops, extracurricular activities, or other situations where special attire may be required to ensure the health or safety of the student.
> The Board authorizes the Superintendent or designee to enforce school rules prohibiting student dress or grooming practices which:
> 1. Present a hazard to the health or safety of the student him/herself or to others in the school.
> 2. Materially interfere with school work, create disorder, or disrupt the educational program.
> 3. Cause excessive wear or damage to school property.
> 4. Prevent the student from achieving his/her own educational objectives because of blocked vision or restricted movement.
> The building principal shall be responsible to monitor student dress and grooming in his/her building.
> Staff members shall be instructed to demonstrate by example and precept positive attitudes toward neatness, cleanliness, propriety, modesty, and good sense in attire and appearance.

11. Defendants' Exhibit 6.

12. Revised District Policy 221 provides:

On February 11, 2008, the Penn Manor School District revised District Policy 221.[11] Specifically, the District added language to the dress and grooming policy that is consistent with the student expression policy and added other aspects to the policy.[12]

> The Board recognizes that each student's mode of dress and grooming is a manifestation of personal style and individual preference.
> The Board has the authority to impose limitations on pupil dress and grooming at school and during school sponsored activities and events. The Board will not interfere with the right of students and their parents to make reasonable decisions regarding student dress and grooming, except when their choices affect the educational program of the schools or the health, safety and welfare of others.
> The Superintendent or designee shall enforce the following guidelines governing dress and grooming:
> 1. Students shall dress in clean, neat, appropriate apparel worn in its intended manner. Any clothing that may damage school property or impact the health, safety and welfare of the school community shall be prohibited.
> 2. Shoes or appropriate footwear shall be worn for health and safety reasons.
> 3. Students shall not wear hats, hoods, headbands or other head coverings or coats, capes or other outerwear in school. Prohibited items worn in violation of District policy shall be confiscated and retained in the office until the conclusion of the school day.
> 4. Students shall not wear clothing, jewelry or any other attire that present a health or safety concern or that advertise or advocate the use of alcoholic beverages, drugs, or other illegal behavior, lewd, profane or obscene language or messages, and messages that disrupt or create a reasonable apprehension of disruption of the educational program, including messages that advocate violence and mayhem, criminal behavior or the violation of Board policy and messages that have as their sole purpose the harassment and/or intimidation of others in the school community.
> 5. All clothing must cover the torso and undergarments. Shorts, pants, skirts and

The District issues a Student Handbook[13] to all students each school year. The Student Handbook includes an Acknowledgment Form that must be signed by each student and demonstrates receipt of the handbook by the students.[14]

The Student Handbook is an administrative document that is designed to help institute the Board of Directors approved and adopted policies and to provide information to students regarding acceptable behavior and disciplinary consequences for inappropriate behavior. In addition, the Student Handbook addresses the District's expectations for appropriate student attire.

The Student Handbook prohibits messages on shirts that "advertise alcoholic beverages, drugs, offensive or obscene language, or messages that promote violence...." Neither Board of Directors policy, nor the Student Handbook prohibits clothing which advocates political positions or patriotic messages.

The "Student Dress Expectations" provision of the Student handbook provides in pertinent part: "The main rule for all students to follow is that of common sense and good judgment. If the faculty and administration feel that a student is displaying poor taste in appearance, it will be brought to his or her attention." However, determinations made by District personnel regarding compliance with the provisions of the Student handbook are directed by and consistent with District policy and are not subject to indiscriminate discretion of any individual staff member.

### Violence in Schools

The problem of violence in schools has dramatically changed over the past 30 to 40 years. In the past, the largest problem regarding violence in schools was that children might get into a fight in the classroom or during recess. That minor, but not unimportant situation has evolved into major problems for public schools trying to adequately protect their students. Some students and others from outside the school community now bring guns into our schools and have committed some truly horrific acts with those weapons.

Schools at all levels have been affected either directly or indirectly by the violent events that have occurred at places like Columbine[15], Virginia Tech[16], Northern Illinois[17], Nickel Mines[18] and Red Lion[19].

dresses must extend to at least the mid-thigh.

The Superintendent shall ensure that all rules and regulations implementing this policy impose only the minimum necessary restrictions on the exercise of the student's taste and individuality.

**13.** Defendants' Exhibit 7.

**14.** In this case, Donald signed the District's Acknowledgment Form on August 27, 2007. Defendants' Exhibit 1.

**15.** On April 20, 1999 two students at Columbine High School in Jefferson County, Colorado embarked on a massacre killing 12 students and one teacher and wounding 23 others before committing suicide. See http://en.wikipedia.org/wiki/Columbine_High_School_massacre.

**16.** On April 16, 2007, on the campus of Virginia Polytechnic Institute and State University (Virginia Tech), in Blacksburg, Virginia a lone gunman killed 32 people and wounded numerous others in two separate incidents two hours apart before committing suicide. See http://en.wikipedia.org/wiki/Virginia_Tech_massacre.

**17.** On February 14, 2008 at Northern Illinois University in Dekalb, Illinois, a gunman killed six and wounded eighteen people. http://en.wikipedia.org/wiki/Northern_Illinois_University_shooting.

**18.** On October 2, 2006 a gunman killed five girls, ages six to thirteen, before committing suicide. This tragedy occurred at the West Nickel Mines School, a one-room Amish schoolhouse in Bart Township, Lancaster County, Pennsylvania. See http://en.wikipedia.org/wiki/Amish_school_shooting.

The impact of violence in schools is so great that it now has equal importance as the issue of illegal drug use in schools.

Public and private schools alike, from elementary schools to major universities have been faced with new challenges to ensure the safety of our children. Elementary, middle and high schools which were once very open now have secure entrances and exits, security cameras, metal detectors, school resource officers and staff who are required to wear identification badges.

School Districts have been forced to implement policies, including new security measures, dress codes and student expression policies to stem the tide of violence which has thrust itself into our places of learning. There is nowhere that is truly safe or immune from the problem of school violence, from the one-room schoolhouse to America's largest universities.

### STANDARD OF REVIEW

■ In considering a motion for preliminary injunction the court must to look at four factors: (1) the likelihood of success on the merits; (2) the extent of irreparable injury from the conduct complained of; (3) the extent of irreparable harm to the defendants if a preliminary injunction issues; and (4) the public interest. *Clean Ocean Action v. York*, 57 F.3d 328, 331 (3d Cir. 1995). A court may not grant injunctive relief without satisfying requirements (1) and (2), regardless of what the equities seem to require. *Adams v. Freedom Forge Corporation*, 204 F.3d 475, 484 (3d Cir.2000).

### CONTENTIONS OF THE PARTIES

#### Plaintiffs' Contentions

Plaintiffs contend that defendants' speech and dress codes and the censoring of Donald's T-shirt violate the constitutional rights of every student in the Penn Manor School District. Specifically, plaintiffs contend that the speech code is unconstitutional because it (1) conditions free speech on the subjective response of listeners or viewers; (2) purports to regulate core protected speech without defining the nature and extent of the regulation; (3) facially prohibits religious points of view that a student views as true; and (4) has been applied to deny Donald his constitutional right to free speech and expression. Plaintiffs argue that this case is a facial, and an as applied, challenge to the various District dress and student expression policies outlined above.

Plaintiffs contend that the District's policies on student speech and dress are overbroad because they seek to punish "anything that is a distraction to the educational environment", the policies prohibit messages that promote violence, that seek the supremacy of any particular religious sect or point of view, or when a teacher or administrator "feels" that a student is displaying poor taste.

Plaintiffs further contend that the speech and dress policies are vague for two reasons: (1) the policies deny students fair notice of the standard of conduct to which they are held accountable; and (2) there is unrestricted enforcement of the policies, thereby inviting arbitrary, discriminatory and overzealous enforcement.

Regarding the message on Donald's T-shirt, plaintiffs contend that the message

---

**19.** On April 24, 2003 at Red Lion Area Junior High School, Red Lion, York County, Pennsylvania a fourteen year old student armed himself with three handguns and shot and killed the school principal and himself in the school cafeteria. See http://en.wikipedia.org/wiki /Red_Lion_Area_Junior_High_School_shooting

on the shirt does not advocate the use of force, promote violence or illegal behavior generally or specifically toward any student, faculty member or other particularized person. Plaintiffs contend that there is no evidence that any one person or persons subjectively believed that the message of Donald's T-shirt was frightening or directed at them personally.

Moreover, plaintiffs contend that the message of the T-shirt is not illegal because the United States Department of State's Bureau of Diplomatic Security administers the "Rewards for Justice" program, which sets bounties on various terrorists. Hence, plaintiffs argue that based upon the Rewards for Justice program, every "person in the world may be a 'licensed terrorist hunter with no bag limit' as proclaimed by [Donald's] shirt." [20]

Plaintiffs contend that the message on Donald's T-shirt represents political and patriotic speech aimed at supporting our troops fighting the war on terror in Afghanistan and Iraq and is specific support for Donald's uncle, Brian Souders, who picked out the T-shirt for Donald.

Furthermore, plaintiffs contend that the District policy as applied to Donald is an unconstitutional abridgment of his right to free speech because there is no government interest justifying the prohibition of his T-shirt.

Plaintiffs assert that they have a likelihood of success on the merits, that Donald and all other students are suffering irreparable harm because of the infringement of their First Amendment rights, that an injunction will not harm defendants and the injunction will serve the public interest.

Plaintiff relies on numerous cases from the United States Supreme Court, the United States Court of Appeals for the Third Circuit and other district and circuit courts, including decisions rendered after completion of the hearing on this matter.[21]

### Defendants' Contentions

Defendants assert that District Policy 220 regarding student speech and District Policy 221 involving student dress and grooming both satisfy the dictates of numerous United States Supreme Court cases.

Defendants contend that pursuant to the recent decision of the United States Supreme Court in *Morse v. Frederick,* — U.S. ——, 127 S.Ct. 2618, 168 L.Ed.2d 290 (2007), the District has the right, without a showing of "substantial disruption", to prohibit student speech that advocates the use of force, violence and violation of law. Furthermore, defendants argue that the special characteristics of the school environment and the governmental and public interest in preventing violence in schools allow schools to restrict student expression which they reasonably interpret as advocating the use of force and violence.

---

**20.** Memorandum in Support of Plaintiff's Findings of Fact and Conclusions of Law filed March 13, 2008 at page 14.

**21.** Since the completion of the March 20, 2008 hearing, plaintiffs' counsel has sent the court three additional cases for the court's review. Specifically, by letter dated April 25, 2008 from Leonard G. Brown, III, counsel for plaintiffs, plaintiffs sent me a copy of the decision of the United States Court of Appeals for the Seventh Circuit in *Nuxoll ex rel. Nux-*

*oll v. Indian Prairie School District # 204*, 523 F.3d 668 (7th Cir.2008).

In addition, by letter dated August 8, 2008 Attorney Brown attached a copy of the decision of the Third Circuit in *DeJohn v. Temple University*, 537 F.3d 301 (3d Cir.2008).

Finally, by letter from Attorney Brown dated September 3, 2008 plaintiffs forwarded me a copy of the decision of the United States Court of Appeals for the Eighth Circuit in *Lowry v. Watson Chapel School District*, 540 F.3d 752 (8th Cir.2008).

Defendants contend that the message expressed on Donald's T-shirt collides with the rights of other students in the most fundamental way, because it undermines the sense of safety and bodily security essential to promoting and maintaining an effective learning environment. Furthermore, defendants argue that courts throughout the country have routinely recognized that schools may regulate student speech which advocates, among other things, violence, anti-social behavior, alcohol and drug use as antithetical to the purpose of public education.

Defendants dispute plaintiffs' assertion that the message on Donald's T-shirt is simply his patriotic way of showing support for the war on terror and of our troops fighting that war on the front lines. Defendants assert that there is nothing on the T-shirt that promotes support of the United States military.

Rather, defendants contend that the T-shirt suggests that volunteer citizens have been authorized to kill suspected terrorists. Defendants further contend that the message is a violent and threatening promotion of vigilante and illegal behavior. Defendants assert that they are duty bound to minimize the very real risk of violence in the District's schools.

Defendants dispute that the provisions of their policies are either vague or overbroad. They argue that the policies are not vague because they identify specific forms of expression that are subject to appropriate regulation in the public school context. Moreover, the policies are not overbroad because they come within the dictates set by the United States Supreme Court for proper limiting of student speech in public schools.

Finally, defendants argue that based upon the revisions of the student speech policy eliminating the prohibitions on student expression regarding religion, that

portion of plaintiffs' motion and claims is now moot.

## DISCUSSION

### First Amendment School Speech

Any discussion of plaintiffs' claims in this case must begin with an analysis of the jurisprudence regarding First Amendment rights of students in school. In this regard, plaintiffs contend that in order to restrain Donald from wearing his T-shirt in school defendants must establish that his speech, through the message of his T-shirt, caused, or was likely to cause, a substantial disruption at the school.

Plaintiffs argue that because no such substantial disruption occurred in this case, nor was one likely to occur, defendants erred in restraining Donald's speech. Plaintiffs rely heavily on the decision of the United States Supreme Court in *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969).

Any discussion of the freedom of speech by students in a public school certainly begins with *Tinker*. In *Tinker*, a group of students decided to wear black arm bands to school in protest of the Vietnam war. The principals of the Des Moines schools became aware of the plan to wear armbands. On December 14, 1965 the principals met and adopted a policy that any student wearing an armband would be asked to remove it, and if the student refused, he or she would be suspended from attending classes until such time as the student returned without the armband. Several students filed suit to restrain the school from disciplining them. 393 U.S. at 504, 89 S.Ct. at 735, 21 L.Ed.2d at 736.

After an evidentiary hearing, the district court dismissed the Complaint and upheld the constitutionality of school district's au-

thority on the ground that it was reasonable in order to prevent disturbance of school discipline. On appeal, the United States Court of Appeals for the Eighth Circuit considered the case *en banc* and was equally divided. Thus, the district court's decision was affirmed. 393 U.S. at 505, 89 S.Ct. at 735–736, 21 L.Ed.2d at 736–737.

The United States Supreme Court accepted the case by granting certiorari. In its decision, the Supreme Court overturned the lower court's ruling and indicated that both students and teachers do have First Amendment rights in school. The Court explained that students and teachers do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." 393 U.S. at 506, 89 S.Ct. at 736, 21 L.Ed.2d at 737.

The Supreme Court further held that students may express their opinions during school hours if they do so

"without materially and substantially interfering with the requirements of appropriate discipline in the operation of the school" and without colliding with the rights of others. But conduct by the student, in class or out of it, which for any reason—whether it stems from time, place or type of behavior—materially disrupts classwork or involves substantial disorder or invasion of rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech.

393 U.S. at 513, 89 S.Ct. at 740, 21 L.Ed.2d at 741. (Internal citations omitted.)

Thus, to prohibit political speech of the kind addressed in *Tinker,* the School District was required to demonstrate beyond a mere desire to "avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." 393 U.S. at 509, 89 S.Ct. at 738, 21 L.Ed.2d at 739. The school district did not establish facts that

would lead to a reasonable forecast of substantial disruption of or material interference with school activities. Moreover, in *Tinker,* the plaintiffs did not interfere with work, cause disorder or interfere with the rights of others. Thus, the prohibition of their speech was unconstitutional. 393 U.S. at 514, 89 S.Ct. at 740, 21 L.Ed.2d at 742.

The type of speech involved in *Tinker* was political speech. In this case, plaintiffs contend that the message communicated on Donald's shirt is also political speech. On the contrary, defendants contend that this case is not about political speech. Defendants assert that the message on Donald's shirt contains images of an automatic weapon and promotes the use of force, violence and violation of law in the nature of illegal vigilante behavior and the hunting and killing of human beings. Because I agree with defendants, further analysis of the caselaw in this area is necessary.

*Tinker* was not the final discussion by the Supreme Court of free speech in the school setting. In *Bethel School District No. 403 v. Fraser,* 478 U.S. 675, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986), the United States Supreme Court again addressed the issue of student speech.

In *Fraser,* a student gave a speech at a school assembly nominating another student for student elective office. The assembly was part of a school-sponsored educational program in self-government. The speech referred to the student candidate "in terms of an elaborate, graphic, and explicit sexual metaphor." The student had previously discussed the proposed speech with two of his teachers and was informed that the speech was inappropriate and might lead to severe consequences. 478 U.S. at 677–678, 106 S.Ct. at 3161–3162, 92 L.Ed.2d at 555.

The student received a three-day suspension from school and was removed from the list of candidates to be a speaker at graduation because the school found the speech to be a violation of the school's policy against obscene, profane language or gestures. The student appealed the school's discipline through the district's grievance procedures. The discipline was upheld, the student served two days of suspension and was allowed to return to school on the third day. 478 U.S. at 678–679, 106 S.Ct. at 3162, 92 L.Ed.2d at 555.

The student brought a civil rights action in district court. The district court ruled that the school's policy was unconstitutionally overbroad and vague. The district court's determination was upheld by the Ninth Circuit. Specifically, the Ninth Circuit found the facts of *Fraser* indistinguishable from the protest armband in *Tinker;* found that the school did not have an interest in protecting a captive audience of minors from lewd and indecent language in a school-sponsored setting because it gave unbridled discretion to the School District in determining what is acceptable and proper speech and behavior in public schools; and denied that the school district had the power incident to its responsibility for the school curriculum to control the language used to express ideas during school sponsored activities. The Supreme Court granted certiorari. 478 U.S. at 679–680, 106 S.Ct. at 3162–3163, 92 L.Ed.2d at 556.

Without applying the substantial and material disruption analysis found in *Tinker*, the Supreme Court reversed the lower court decision in *Fraser*. In doing so, the Supreme Court focused on the speech itself. The Court stated:

Surely it is a highly appropriate function of public school education to prohibit the use of vulgar and offensive terms in public discourse. Indeed, the "funda-

mental values necessary to the maintenance of a democratic political system" disfavor the use of terms of debate highly offensive or highly threatening to others. Nothing in the Constitution prohibits the states from insisting that certain modes of expression are inappropriate and subject to sanctions. The inculcation of these of these values is truly the "work of the schools". . . .

The process of educating our youth for citizenship in public schools is not confined to books, the curriculum and the civics class; schools must teach by example the shared values of a civilized social order.

478 U.S. at 683, 106 S.Ct. at 3164, 92 L.Ed.2d at 558. (Internal citations omitted.)

The *Fraser* court quoted favorably from Justice Black's dissent in *Tinker* that the federal Constitution does not "compel the teachers, parents, and elected school officials to surrender control of the American public school system to public school students." *Fraser*, 478 U.S. at 686, 106 S.Ct. at 3166, 92 L.Ed.2d at 560 (quoting *Tinker*, 393 U.S. at 526, 89 S.Ct. at 746, 21 L.Ed.2d at 749 (Black, J., dissenting)).

The Supreme Court next addressed freedom of speech in public schools in *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988). The issue in *Kuhlmeier* was whether censoring by the School District of a school newspaper violated the First Amendment rights of the student staff of the newspaper.

In *Kuhlmeier* the Supreme Court distinguished the case at hand from *Tinker* in that *Tinker* addressed whether the First Amendment requires a school to tolerate certain student speech and *Kuhlmeier* deals with whether the First Amendment requires a school affirmatively to promote particular student speech. 484 U.S. at

270–271, 108 S.Ct. at 569–570, 98 L.Ed.2d at 605.

The Supreme Court concluded that the *Tinker* analysis was not applicable to the situation in *Kuhlmeier*. The court stated:

> [T]he standard articulated in *Tinker* for determining when a school may punish student expression need not also be the standard for determining when a school may refuse to lend its name and resources to the dissemination of student expression. Instead, we hold that educators do not offend the *First Amendment* by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns.

484 U.S. at 272–273, 108 S.Ct. at 571, 98 L.Ed.2d at 606. (Footnote omitted.)

Finally, *Kuhlmeier* reiterated certain tenets contained in both *Tinker* and *Fraser*. Specifically, the Supreme Court stated:

> the First Amendment rights of students in the public schools "are not automatically coextensive with the rights of adults in other settings," and must be "applied in light of the special characteristics of the school environment." A school need not tolerate student speech that is inconsistent with its "basic educational mission," even though the government could not censor similar speech outside the school.

484 U.S. at 266, 108 S.Ct. at 567, 98 L.Ed.2d at 602.

The most recent Supreme Court decision to address freedom of speech in the public schools, and one relied on heavily by defendants, is *Morse v. Frederick*, —— U.S. ——, 127 S.Ct. 2618, 168 L.Ed.2d 290 (2007).

In *Morse*, Joseph Frederick and his classmates were attending a school-sponsored social event or class trip to view the Olympic torch relay for the Salt Lake City Winter Olympic Games. As the torchbearer and television cameras covering the event approached, several students unfurled a banner that read "BONG HiTS 4 JESUS".[22] —— U.S. at ——, 127 S.Ct. at 2622, 168 L.Ed.2d at 296.

Deborah Morse, the school principal, directed the students to take the banner down. All the students except Frederick complied with her directive. Frederick was later suspended from school by Morse for ten days. Morse explained that she directed that the banner be taken down because she thought it encouraged illegal drug use, in violation of established school policy. —— U.S. at ——, 127 S.Ct. at 2622–2623, 168 L.Ed.2d at 296.

Frederick administratively appealed his suspension, which was ultimately upheld, but was reduced from ten to eight days. Frederick brought suit alleging that his First Amendment rights were violated by the school's actions. The District Court granted summary judgment in favor of the school finding that Morse reasonably interpreted the banner as promoting illegal drug use and that Morse had the authority, if not the obligation, to stop such messages at a school-sanctioned activity. —— U.S. at ——, 127 S.Ct. at 2623, 168 L.Ed.2d at 297.

The Ninth Circuit reversed the trial court, deciding that Frederick acted during a school-authorized activity and that the banner expressed a positive sentiment about marijuana use, but that the school violated Frederick's First Amendment rights and punished him without a showing that his speech gave rise to a substantial

---

**22.** "Bong hits" is a reference to a manner of smoking marijuana.

risk of disruption. —— U.S. at ——, 127 S.Ct. at 2623, 168 L.Ed.2d at 297–298.

In its decision, the United States Supreme Court framed the issue as "whether a principal may, consistent with the First Amendment, restrict student speech at a school event, when that speech is reasonably viewed as promoting illegal drug use. We hold that she may." —— U.S. at ——, 127 S.Ct. at 2625, 168 L.Ed.2d at 300. The Court again emphasized the facts of *Tinker* were quite stark and that political speech in that case implicated "concerns at the heart of the First Amendment." —— U.S. at ——, 127 S.Ct. at 2626, 168 L.Ed.2d at 300.

The Supreme Court further reiterated that *Fraser* established that *Tinker* analysis is not "absolute" and the Court did not perform a substantial disruption analysis. The Court found that the banner in *Morse* was reasonably viewed as promoting illegal drug use, the promotion of illegal drug use was against school policy, and that the First Amendment does not require schools to tolerate student expression of illegal drug use at school functions. —— U.S. at ——, 127 S.Ct. at 2629, 168 L.Ed.2d at 303–304.

In addition, the concurring opinion of Justice Alito in *Morse* provides some guidance in the application of the facts of this case to the current state of the law. Specifically, Justice Alito stated:

[A]ny argument for altering the usual free speech rules in the public schools cannot rest on a theory of delegation but must instead be based upon some special characteristic of the school setting. The special characteristic that is relevant in this case is the threat to the physical safety of students. School attendance can expose students to threats to their physical safety that they would not otherwise face. Outside of school, parents can attempt to protect their children in many ways and may take steps to monitor and exercise control over the persons with whom their children associate. Similarly, students, when not in school, may be able to avoid threatening individuals and situations. During school hours, however, parents are not present to provide protection and guidance, and students' movements and their ability to choose the persons with whom they spend time are severely restricted. Students may be compelled on a daily basis to spend time at close quarters with other students who may do them harm. Experience shows that schools can be places of special danger.

In most settings, the First Amendment strongly limits the government's ability to suppress speech on the ground that it presents a threat of violence. But due to the special features of the school environment school officials must have greater authority to intervene before speech leads to violence.

—— U.S. at ——, 127 S.Ct. at 2638, 168 L.Ed.2d at 313. (Citations omitted.)

■ A review of the above-cited cases indicates that the *Tinker* analysis advocated by plaintiffs is not absolute and not always applicable in freedom of speech cases in school settings. Furthermore, a school can validly restrict speech that is vulgar, lewd or obscene or that is promoted in school sponsored publications.

Based upon *Morse*, speech that promotes illegal behavior may also be restricted. *See J.S. ex rel. Snyder v. Blue Mountain School District*, 2008 WL 4279517 at *6 (W.D.Pa. September 11, 2008) (Munley, J.). Moreover, based upon Justice Alito's concurring opinion in *Morse*, it is clear that the threat of violence in the school setting and the safety of our schools is of the utmost importance.

In the context of this analytical background, I address plaintiffs' within motion.

*Likelihood of Success*

### T-shirt's message

The threshold question in assessing plaintiffs' claims is characterizing the message on Donald's T-shirt. The T-shirt prominently displays images of an automatic handgun on the front pocket area and back of the T-shirt. The front pocket of the T-shirt is also imprinted with the statement "Volunteer Homeland Security" with the image of an automatic handgun placed between the word "Volunteer" above the handgun and the words "Homeland Security" below the handgun.

The back of the T-shirt is imprinted with the statement "Special Issue–Resident–Lifetime License, United States Terrorist Hunting Permit, Permit No. 91101, Gun Owner–No Bag Limit" in block letters superimposed over a larger automatic handgun.

Plaintiffs contend that the message of Donald's T-shirt is a political message expressing support for our troops and for his uncle who is serving this country and is currently stationed in Iraq. Furthermore, plaintiffs assert that the message of this T-shirt is buttressed by the fact that in 1984 Congress enacted the Act to Combat International Terrorism, Public Law 98–533. This Act established the "Rewards for Justice" program which sets bounties on various terrorists.

Plaintiffs argue that pursuant to the Rewards for Justice Program every person in the world may be "a licensed terrorist hunter with no bag limit", mimicking the words on Donald's T-shirt. Plaintiffs further argue that Donald's T-shirt advocates support of United States policy in support of the elimination of terrorists.

Plaintiffs assert that the T-shirt does not state that one may "shoot to kill" terrorists or that terrorists will be "shot on sight". Plaintiffs further assert that even if those words appeared on the T-shirt, the illegality of such a statement would be an open question because it would not be illegal for a soldier, such as Donald's uncle, to "shoot to kill" a terrorist.

Defendants contend that Donald's T-shirt advocates the use of force, violence and violation of law in the form of illegal vigilante behavior and the hunting and killing of human beings. Defendants further contend that Donald's T-shirt contains no references to any branch of the United States military or military operations in Iraq, Afghanistan or any other part of the world.

In addition, defendants argue that Donald's T-shirt is designed to replicate a hunting license issued for hunting and killing human beings. The phrase "Gun Owner–No Bag Limit" printed on the back of the T-shirt is a direct reference to laws imposed on hunters restricting the number of animals within a specific species or group of species the licensee may kill and keep.

Defendants assert that plaintiffs' contention that the language of the message on the back of the T-shirt is authorized by the Rewards for Justice program is wholly without merit. Defendants assert that the program offers rewards for information leading to the arrest and conviction of terrorist.

■ Furthermore, defendants contend that the program strongly discourages bounty hunters and other non-governmental individuals from pursuing the capture of terrorists. Finally, defendants aver that the program clearly does not condone the killing of terrorists by private citizens. For the following reasons, I agree with defendants.

The language on Donald's T-shirt advocates the use of force, violence and violation of law in the form of illegal vigilante behavior and the hunting and killing of human beings. There is no "Volunteer Homeland Security" in this country. The message of the T-shirt implies that Donald is licensed to hunt and kill terrorists (i.e. other human beings) with no "bag limit". A bag limit is a "law imposed on hunters and fisherman restricting the number of animals within a specific species they may kill and keep."[23] A "No Bag Limit" indicates that there is no restriction regarding how many kills can be made. This implies that Donald is licensed to kill as many terrorists as he can conceivably hunt down.

Furthermore, after review of the website for the Rewards for Justice program, I agree with defendants that plaintiffs' assertion that this program provides some legal basis for the message on the shirt is wholly without merit. The program is clearly designed for the purpose of obtaining information from individuals leading to successful arrest and prosecution of suspected terrorists. It in no way authorizes non-governmental personnel to hunt or kill suspected terrorists. While Donald's uncle, Brian Souders, a member of the United States Army may be so authorized, Donald is clearly not.[24] Plaintiffs cite no other authority permitting such conduct.

Black's Law Dictionary defines vigilantism as: "The act of a citizen who takes the law into his or her own hands by apprehending and punishing suspected criminals."[25] This is the message of Donald's T-shirt, that as a volunteer member of homeland security, he is licensed to hunt and kill as many terrorists that he wants. The T-shirt advocates private citizens taking the law into their own hands. Thus, the T-shirt advocates illegal conduct. The message conveyed is a violent and threatening promotion of vigilante behavior.

Donald's T-shirt no doubt means a great deal to him because it was chosen for him by his uncle. However, Donald's patriotic sentiment for the shirt is not communicated anywhere on the shirt. As noted in *Morse,* Donald's explanation is a description of his motive, not the interpretation of what his T-shirt says. —— U.S. ——, 127 S.Ct. at 2625, 168 L.Ed.2d at 299.

The undeniable message of Donald's T-shirt cannot be dismissed because of the motive behind the message. There is no way to determine the motive from the T-shirt itself and the motive does not dismiss as meaningless the message that has no place in a public school. Thus, I conclude that there is no constitutionally protected political message contained in Donald's shirt but there is a message of use of force, violence and violation of law in the form of illegal vigilante behavior.

Accordingly, based upon the Supreme Court's post-*Tinker* jurisprudence, I conclude that defendants do not have to demonstrate a substantial and material disruption to restrict Donald from wearing his T-shirt.

### Overbreadth

 "A regulation of speech may be struck down on its face if its prohibitions are sufficiently overbroad—that is if it reaches too much expression that is protected by the Constitution." *Sypniewski v. Warren Hills Regional Board of Education,* 307 F.3d 243, 258 (3d Cir.2002). The District's student expression and dress and grooming policies can be found

---

23. See http://en.wikipedia.org/wiki/Bag_limits.

24. See www.rewardsforjustice.net.

25. *Black's Law Dictionary,* 1599 (8th ed.2004).

to be unconstitutionally overbroad if there is a likelihood that the policies' very existence will inhibit free expression. *Saxe v. State College Area School District,* 240 F.3d 200, 214 (3d Cir.2001).

Courts will not strike down a policy as overbroad unless the overbreadth is substantial in relation to the policies' plainly legitimate sweep. In addition, a policy will only be struck down on an overbreadth challenge if no reasonable limiting construction is available that will render the policy constitutional. Moreover, every reasonable construction must be resorted to in order to save the policy from unconstitutionality. *Sypniewski,* 307 F.3d at 259.

Plaintiffs contend that the District policies on student speech and dress are overbroad because they seek to punish "anything that is a distraction to the educational environment", and that the school policies prohibit messages which promote violence, when a teacher or administrator "feels" that a student is displaying poor taste or that the student message seeks to promote the supremacy of any particular religious sect or point of view. I will now address these contentions concerning the District policies..

Initially, I note that plaintiff only challenges the original versions of Policies 220 and 221. As noted above, both policies were revised on February 11, 2008. Thus, I do not pass on the constitutionality of the revised policies because they have not been attacked by plaintiffs.

Next, a review of the policies reveals that the phrase "anything that is a distraction of the education environment" is not present in District Policy 220, 221 or the School Dress Expectations section of the Student Handbook.[26] However, it is present in the Offense/Punishment Chart section of the Student Handbook.[27] The Principal's Message section of the Student Handbook indicates that "the handbook is designed to inform the student body and parents of policies and procedures established at Penn Manor High School." [28]

Thus, while the phrase "anything that is a distraction to the education environment" is not present in District Policy 220, 221 or the School Dress Expectations section of the Student Handbook, it is intended to be a policy of the District by virtue of the Principal's Message section. For the following reasons, I conclude that this phrase is substantially overbroad and unconstitutionally restricts student speech.

The phrase "anything that is a distraction to the education environment" could encompass student speech that is both protected and unprotected by the First Amendment. Specifically, it could reach unprotected speech such as shouting "fire" in a crowded auditorium when there is none, which is not protected speech in any context. Conversely, the wearing of a black armband in protest could distract the educational environment, but could not be regulated because it is protected activity. *Tinker, supra.*

The limiting language of Policies 220 and 221 are helpful to the District, but does not circumvent the possibility that a substantial amount of protected speech may be suppressed by the provision. *Sypniewski, supra.* Accordingly, I conclude that plaintiffs have a likelihood of success on the merits of establishing that this provision is overbroad.

Next, I note that plaintiffs have cited no legal authority to support their conclusion

---

**26.** Defendants' Exhibit 7, page 18.

**27.** Defendants' Exhibit 7, page 34.

**28.** Defendants' Exhibit 7, page 6.

that the District's policies are overbroad because they prohibit messages which promote violence. In addition, Plaintiffs cite no authority for the proposition that plaintiff Donald Miller has a constitutional right to wear clothing which advocates violence in public schools.

To the contrary I conclude that a substantial interest resides in public schools to discourage violence both in the school setting as well as in the community at large as part of the District's overall educational mission. As noted by Justice Alito in his concurring opinion in *Morse*, "In most settings, the First Amendment strongly limits the government's ability to suppress speech on the ground that it presents a threat of violence. But due to the special features of the school environment school officials must have greater authority to intervene before speech leads to violence." —— U.S. at ——, 127 S.Ct. at 2638, 168 L.Ed.2d at 313.

█ In the face of the utter lack of authority and the absence of argument except the bald assertion that plaintiff should be permitted to wear a T-shirt promoting violence, I conclude that plaintiff fails on his overbreadth challenge on this point and has no likelihood of success on the merits of this claim.

█ Regarding plaintiff's overbreadth challenge on the language of the Student Handbook that discipline may be imposed when a teacher or administrator "feels" that a student is displaying poor taste, I find plaintiffs' position unpersuasive based upon the limiting language of the actual policies.

A review of defendants' policies reflects substantial limiting language contained in the policies themselves. Specifically, District Policy 220 on Student Expression provides in pertinent part:

> The Board respects the rights of students to express themselves in word or symbol and to distribute materials as a part of that expression, but it also recognizes that the exercise of that right must be limited by the district's responsibility to maintain an orderly school environment and protect the rights of all members of the school community.

In addition, District Policy 221 on Dress and Grooming provides:

> The Board recognizes that each student's mode of dress and grooming is a manifestation of personal style and individual preference.
> The Board will not interfere with the right of students and their parents to make decisions regarding their appearance, except when their choices affect the educational program of the schools or the health and safety of others.

The complete complained-of provision in the Student Handbook provides: "The main rule for all students to follow is that of common sense and good judgment. If the faculty and administration feel that a student is displaying poor taste in appearance it will be brought to his or her attention." [29]

The complete provision together with the limiting language contained in district Policies 220 and 221 reveal that the complained-of portion of the Student Handbook does not provide for any discipline or sanction if the faculty or administration "feel[s] that the student is displaying poor taste in appearance." Rather, the provision provides merely that it will "be brought to the student's attention."

The limiting language of the District policies reflects that the District is wholly cognizant of students' rights of expression

---

**29.** Defendants' Exhibit 7, page 18.

and rights concerning personal appearance and style. Moreover, "[t]he Board will not interfere with the right of students and their parents to make decisions regarding their appearance, except when their choices affect the educational program of the schools or the health and safety of others."

Thus, with the limitation set forth in District Policies 220 and 221 together with a complete reading of the allegedly offending language, I conclude that the provision is not overbroad, and is clearly not substantially overbroad. *See Broadrick v. Oklahoma,* 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973).

Accordingly, I conclude that plaintiffs fail to show a likelihood of success on the merits on this claim.

Finally, plaintiffs assert that District Policy 220 on Student Expression prohibiting expressions that "seek to establish the supremacy of a particular religious denomination, sect or point of view" is overbroad. I note that defendants subsequently revised District policy to remove this language. Defendants contend that the revision makes this challenge moot. I disagree.

While defendants has changed District Policy 220 to delete the offending language, it would be free to reinstate the language after the completion of this litigation absent injunctive relief. *See DeJohn v. Temple University,* 537 F.3d 301, 308–313. Thus, plaintiff's claim is not moot.

 However, defendants have not provided any argument or analysis why its former policy is not overbroad. Moreover, a review of the language of the former provision leaves the court with the firm conviction that the language of the provision would encroach on constitutionally permissible student speech. Defendants' former provision attempted to restrict what effectively amounts to all religious speech, which is clearly not permissible under the First Amendment. Thus, I conclude that the former provision regarding religious speech was overly broad.

Accordingly, I find that plaintiffs would likely prevail on the merits of this claim. Hence I will grant a preliminary injunction against defendants and restrain them from reestablishing the former policy provision concerning religious speech.

### Vagueness

 A statute or governmental regulation may be deemed unconstitutionally vague if it fails to give a person adequate warning that certain conduct is prohibited or if it fails to set forth adequate standards to prevent arbitrary and discriminatory enforcement. *City of Chicago v. Morales,* 527 U.S. 41, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999). However, "given [a] school's need to be able to impose disciplinary sanctions for a wide range of unanticipated conduct disruptive of the educational process, the school disciplinary rules need not be as detailed as a criminal code which imposed criminal sanctions." *Fraser,* 478 U.S. at 686, 106 S.Ct. at 3166, 92 L.Ed.2d at 560.

Plaintiffs contend that the speech and dress policies are vague for two reasons: (1) the policies deny students fair notice of the standard of conduct to which they are held accountable; and (2) there is unrestricted enforcement of the policies, thereby inviting arbitrary, discriminatory and overzealous enforcement.

Defendants contend that the District's policies and Student Handbook provisions are appropriate because they enable the District to foster its educational mission while maintaining the full range of student rights and student responsibilities to others in the school community. For the following reasons, I agree with defendants in part, and with plaintiffs in part, and

conclude that the District's policies and provisions are unconstitutionally vague in part and constitutionally permissible in part.

The United States Supreme Court has recognized that "maintaining security and order in schools requires a certain degree of flexibility in school disciplinary procedures...." *New Jersey v. T.L.O.*, 469 U.S. 325, 340, 105 S.Ct. 733, 742, 83 L.Ed.2d 720, 733 (1985).

■ Regarding plaintiffs' contention that District policies deny students fair notice of the standard of conduct to which they are held accountable, plaintiffs assert that two specific provisions of the student handbook are unconstitutionally vague. Initially, plaintiffs' contend that the District bans "anything that is a distraction." As noted above, the phrase "anything that is a distraction" is not present in either District Policies 220, 221 or the School Dress Expectations section of the Student Handbook. Rather, it is contained in the Offense/Punishment Chart section of the Student Handbook. I have already concluded that the provision is overbroad. I further conclude that the provision is vague because it does not adequately put students on notice of what standard of conduct for which they are held accountable.

Next, plaintiffs assert that the provision banning messages that promote violence is vague. Plaintiffs argue that this phrase is inherently dependent on subjective, individual definitions of prohibited expression and therefore invites arbitrary, discriminatory and overzealous enforcement.

In crafting policies and regulations, public school administrators cannot be expected to foresee the myriad ways in which students might conceivably exceed the permissible bounds of protected speech. The District has limiting language in Policies 220 and 221 which notes that it respects the rights of students to express themselves in word or symbol. Moreover, though not specifically before the court, the new revised District Policies 220 and 221 have expanded that language to more fully explain that the District does not intend to subvert the constitutional rights of students' freedom of expression.

■ Finally, as noted above, plaintiffs have not provided this court with any authority that indicates that students have any right to communicate a message promoting violence in public schools. Promoting violence in public schools is antithetical to the mission of public schools. Violence has no place in our public schools. Students have no constitutional right to promote violence in our public schools. Accordingly, I conclude that plaintiffs do not have a likelihood of success on the merits on this claim.

Finally, plaintiffs assert that there is unrestricted enforcement of defendants' policies against any District student, thereby inviting arbitrary, discriminatory and overzealous enforcement. Plaintiffs argument in this regard is unclear, but seems to indicate that defendants' policies apply to all District students. Because plaintiffs cite no authority for the proposition that the District cannot apply its policies equally to all students, nor do they meaningfully brief their arbitrariness argument, I deny plaintiffs' claim in this respect.

### As Applied Challenge

As noted above, I conclude that the message on Donald's T-shirt is not protected speech. Rather, it violates numerous sections of the District policies prohibiting clothing which advocates messages that promote violence and violation of law. The District attempted to deal with the T-shirt in a *reasonable and effective manner*, as it is permitted to do under *Morse* and *Fraser*.

Specifically, Ms. Baireuther received a complaint from another student about Donald's T-shirt. She asked Donald to step into the hallway and discussed with him the message and images printed on the T-shirt.

Ms. Baireuther explained to Donald that the shirt's message promoted the hunting and killing of human beings and might not be appropriate for school. Moreover, the picture of the gun on the shirt might frighten other students or make them uncomfortable because of previous incidents at other schools where students took guns to school and shot students.

Ms. Baireuther further explained to Donald that she would check with school administrators to determine if the T-shirt was in violation of school district policy.

After consulting with the building principal, Ms. Baireuther was advised that the T-shirt was inappropriate and violated established school district policy. A few days later, Donald wore the T-shirt to school again. Ms. Baireuther advised him that after consulting with school district administration, she confirmed that he was not permitted to wear this particular T-shirt to school and if he wore the T-shirt again she would have to send him to the principal's office.

Despite the directive from Ms. Baireuther, on November 28, 2007, Donald wore the T-shirt again. When Donald entered her class on that date, Ms. Baireuther saw the T-shirt and took Donald out to the hallway to speak with him. Ms. Baireuther reiterated to Donald that he was not permitted to wear the T-shirt to school and sent him to the principal's office.

Donald was not disciplined for wearing his T-shirt, though he could have been for repeated failure to follow District policy. Rather, he was disciplined for failing to follow direction and for using foul language. There is no indication that the School District's policies or the way Donald was treated indicates that his First Amendment rights were violated in any way.

Because I find that the message on Donald's T-shirt is not protected speech and that the School District's policies do not violate the First Amendment as applied specifically to Donald regarding his T-shirt, I conclude that plaintiffs do not have a likelihood of success on the merits of their "as applied" claim.

*Irreparable Harm to Plaintiffs*

When First Amendment interests are either threatened, or in fact being impaired at the time relief is sought, the loss of First Amendment freedoms, for even a minimal period of time, unquestionably constitutes irreparable injury. *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 2690, 49 L.Ed.2d 547.

In this case, I conclude that plaintiffs have established irreparable harm regarding the portions of defendants' policies prohibiting expressions that "seek to establish the supremacy of a particular religious denomination, sect or point of view" and that punish "anything that is a distraction to the education environment," because, as discussed above, the overbroad language likely constitutes a first Amendment violation. Specifically, under the standard established by the Supreme Court in *Elrod,* plaintiffs have established irreparable injury.

Regarding all of plaintiffs' other claims, because I find no likelihood of success on the merits, I conclude that there is no irreparable injury suffered by plaintiffs.

*Irreparable Harm to Defendants*

Enjoining the overly broad and impermissibly vague language will not harm the defendants. "Everyday school discipline does not depend on the necessity of a

speech code." *Sypniewski*, 307 F.3d at 259. Moreover, defendants are not harmed by enjoining overbroad and vague District policies. *Sypniewski, supra.*

### Public Interest

An injunction will serve the public interest in this case regarding those provisions which I conclude are unconstitutionally vague or overbroad. "In the absence of legitimate countervailing concerns, the public interest clearly favors the protection of constitutional rights...." *Council of Alternative Political Parties v. Hooks,* 121 F.3d 876, 884 (3d Cir.1997).

### BOND

Federal Rule of Civil Procedure 65(c) requires imposition of a bond to secure the payment of such costs and damages not to exceed such sum as may be suffered or sustained by any party who is found to be wrongfully restricted by this Order. Thus, I direct plaintiffs to post bond or other acceptable security with the Clerk of Court for that purpose in the amount of $5,000.00 no later than October 8, 2008.

### CONCLUSION

For all the foregoing reasons, I grant plaintiffs' Motion for Preliminary Injunction in part and deny it in part. Specifically, I conclude that plaintiffs have shown a likelihood of success on the merits regarding defendants' policy prohibiting certain religious expression as overbroad and find that portion of defendants' policies prohibiting anything that is a distraction to the educational environment to be overbroad and vague.

I further conclude that plaintiffs have established irreparable harm, that defendants will not be irreparably harmed and that the public interest favors protection of constitutional rights regarding the vague and overly broad provisions.

I conclude that defendants' policy prohibiting promoting violence is not unconstitutionally overbroad or vague. Moreover, I conclude that defendants policies as applied to Plaintiff Donald Miller, III, are not unconstitutional. Thus, except as specifically provided for in this Opinion and accompanying Order, in all other respects, I deny plaintiffs' motion.